UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

FAIR HOUSING JUSTICE CENTER, INC.;
LISA DARDEN; CLAUDE JAY JONES;                        16 Civ. 8606
and ADRIENNE WILLIAMS,
                                                     **COMPLAINT AND**
                    Plaintiffs,                      **DEMAND FOR JURY TRIAL**

              v.

ULSTER SAVINGS BANK,

                    Defendant.

-------------------------------------------------------------X

          Plaintiffs Fair Housing Justice Center, Inc., Lisa Darden, Claude Jay Jones, and

Adrienne Williams, by and through their attorneys, Cuti Hecker Wang LLP, for their Complaint

allege as follows:

**<u>INTRODUCTION</u>**

      1.     In its effort to promote its mortgage lending business, Ulster Savings Bank

highlights the importance of identifying with precision a customer's "Buying Power" – that is,

figuring out exactly how much a customer can afford to pay for a house.  The bank emphasizes

that buying a home "starts with finding a lender you can trust . . . someone who knows the local

community and the local real estate market."

      2.     But for Ulster Savings Bank, determining an African American customer's

"Buying Power" has more to do with the color of her skin than objective financial indicators like

her income, her savings, or her credit score, and the bank's "knowledge" of the local community

and local real estate market is used to guide African Americans to less favorable mortgage terms

and away from whiter villages or towns.

3.      Throughout an extensive investigation, spanning nearly two years, the nonprofit Fair Housing Justice Center, Inc., discovered that Ulster Savings Bank loan officers – across geographically different offices – repeatedly offered less favorable and lower loan packages and options to African Americans than to their white counterparts, even as the African Americans presented with *higher* income, *more* cash savings, *lower* monthly liabilities, and *better* credit scores than those white counterparts.  For example, one African American tester was told he qualified for a maximum loan amount that was $200,000 less than his white counterpart. Another African American tester was informed she could afford a purchase price that was $150,000 less than the maximum purchase price her white counterpart was told she could afford. Several loan officers also appeared to guide African Americans towards villages or towns that had higher percentage minority populations, while guiding potential white borrowers towards villages with proportionately whiter populations.

4.      Indeed, Ulster Savings Bank's entire structure seems pointedly crafted to avoid lending its money to African Americans to achieve the American dream of buying a home. Despite a robust and apparently growing business, Ulster Savings Bank appears studiously to have avoided opening offices in predominantly minority towns or villages, and even in one instance when it did, the bank avoided placing a loan officer in that bank.

5.      It is no surprise, then, that Ulster Savings Bank rarely provides mortgages to African Americans.  Over the most recent five years of publicly available data, from 2011 to 2015, it made only 40 primary loans to African American borrowers or co-borrowers for principal home purchases, out of a total of 1,599 such mortgages.  In other words, only 2.5% of mortgage borrowers were African American.  And, out of the 112 loans made across Long Island over the same time period, only a single one was to an African American borrower.

6. For African Americans, Ulster Savings Bank is not "a lender you can trust." Instead, it is a lender that seeks to court and favor others, and to avoid lending African Americans money to purchase homes, or at a minimum, to avoid making mortgages to African Americans on the same or equally beneficial terms and conditions as whites.

7. It is precisely this type of ingrained and pervasive behavior of treating African Americans worse, offering them lower amounts of mortgages and guiding them to lower-priced houses or towards towns or villages that have higher minority populations, that results in serious, long-lasting negative consequences for African Americans. Most immediately, the result of buying lower-priced homes generally means that African Americans are purchasing lower-valued homes, which in turn results in their obtaining less equity in their homes and restricting their ability to acquire long-term wealth. Equally critically, buying lower-priced homes generally means African Americans are being directed into areas with fewer opportunities and options, whether it is because the local schools are not quite as high-achieving, because the transportation routes to higher paying jobs are more time consuming, or because basic amenities are more limited. And yet these limitations – which aggregate over time and accumulate powerfully against the homebuyers themselves and their children – have nothing to do with objective financial indicators and everything to do with unlawful bias. The result is that even a successful African American, seeking to live the American dream of owning a home, is hindered and limited because of her skin color.

8. This action seeks to correct and to remedy Ulster Savings Bank's unacceptable and far-reaching behavior. Plaintiffs – both the Fair Housing Justice Center, Inc. ("FHJC") and three of its African American testers who were treated worse than white testers – are entitled to

declaratory and injunctive relief, compensatory damages, punitive damages, and an award of costs and attorneys' fees.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and pursuant to 42 U.S.C. § 3613.

10.     Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b)(2).

## JURY DEMAND

11.     Plaintiffs hereby demand a trial by jury.

## PARTIES

12.     Plaintiff FHJC is a non-profit organization incorporated in the State of New York and based in New York City.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York region by eliminating housing discrimination and creating open and inclusive communities.  FHJC expended staff time and other resources to investigate and respond to Defendant's discriminatory housing policies and practices, which diverted resources away from other FHJC activities.  Defendant's discriminatory housing policies and practices also frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in the New York region.

13.     Plaintiff Lisa Darden is an African American woman who is a citizen of the United States and a resident of New York, New York.  During all relevant times, Plaintiff Darden worked for the FHJC as a tester, in order to determine whether individuals and/or corporations were following the law and providing equal opportunities for access to residential housing, including through lending.  Plaintiff Darden was harmed by Defendant's conduct because it was humiliating and denigrating and treated her as less than her white counterparts.

14.    Plaintiff Claude Jay Jones is an African American man who is a citizen of the United States and a resident of New York, New York.  During all relevant times, Plaintiff Jones worked for the FHJC as a tester, in order to determine whether individuals and/or corporations were following the law and providing equal opportunities for access to residential housing, including through lending.  Plaintiff Jones was harmed by Defendant's conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

15.    Plaintiff Adrienne Williams is an African American woman who is a citizen of the United States and a resident of New York, New York.  During all relevant times, Plaintiff Williams worked for the FHJC as a tester, in order to determine whether individuals and/or corporations were following the law and providing equal opportunities for access to residential housing, including through lending.  Plaintiff Williams was harmed by Defendant's conduct because it was humiliating and denigrating and treated her as less than her white counterpart.

16.    Ulster Savings Bank (the "Bank") was founded in 1851 as Ulster County Savings Institution, and has remained registered and regulated by New York State.  It is headquartered at 180 Schwenk Drive, Kingston, New York 12401, and maintains 14 branches located in, among others, Dutchess, Orange, and Ulster Counties.  Separate and apart from 14 branches, Ulster Savings Bank has 15 loan officers (called "mortgage specialists"), spread over eight offices, including in Kingston, Red Hook, two Poughkeepsie offices, Wappingers Falls, Goshen, White Plains, and Riverhead, Long Island.  At all relevant times hereto, the Bank was responsible for hiring, training, monitoring, and disciplining its mortgage specialists and approving the terms and conditions of any and all mortgages made by such specialists.

17.    At all relevant times hereto, David Catalano, Margaret O'Connor, Jack Fanning, Susan Boersema, Shawn Simmons, and Mike Kienle were employed by the Bank and/or acted as

agents on behalf of the Bank to attempt to sell and to actually sell loans, mortgages, and products to the public on the Bank's behalf.

18.      Currently, Ulster Savings Bank is FDIC insured, and its FDIC certificate number is 15970.  As of June 30, 2016, it reported total assets of $790,403,000 and total deposits of $680,028,000.

19.      For home mortgage consultations in Dutchess County, Ulster Savings Bank has an office located at 39 Burnett Road, Poughkeepsie, New York 12603.  At all relevant times hereto, the Bank employed Shawn Simmons and Mike Kienle at this location and/or Shawn Simmons and Mike Kienle acted as agents on behalf of the Bank.  At all relevant times hereto, Shawn Simmons and Mike Kienle acted within the scope of their employment and/or duties and on behalf of the Bank.

20.      For home mortgage consultations in Orange County, Ulster Savings Bank has an office located at 7 Coates Drive, Goshen, New York 10924.  At all relevant times hereto, the Bank employed Jack Fanning and Susan Boersema at this location and/or Jack Fanning and Susan Boersema acted as agents on behalf of the Bank.  At all relevant times hereto, Jack Fanning and Susan Boersema acted within the scope of their employment and/or duties and on behalf of the Bank.

21.      For home mortgage consultations in Suffolk County, Ulster Savings Bank has an office located at 633 E. Main Street, Riverhead, New York 11901.  At all relevant times hereto, the Bank employed David Catalano at this location and/or David Catalano acted as an agent on behalf of the Bank.  At all relevant times hereto, David Catalano acted within the scope of his employment and/or duties and on behalf of the Bank.

22.     For home mortgage consultations in Westchester County, Ulster Savings Bank has an office located at 399 Knollwood Road, Suite 202, White Plains, New York 10603.  At all relevant times hereto, the Bank employed Margaret O'Connor at this location and/or Margaret O'Connor acted as an agent on behalf of the Bank.  At all relevant times hereto, Margaret O'Connor acted within the scope of her employment and/or duties and on behalf of the Bank.

## FACTUAL ALLEGATIONS

### Ulster Savings Bank

23.     Ulster Savings Bank was founded in 1851, and purports to have "locations throughout the Hudson Valley."  Yet nearly all of its branches and offices are located in predominantly white areas, and although the Bank did open a branch in Newburgh in 2013 – a town with relatively more African American residents as compared to other towns with Ulster Savings Bank branches – the Bank notably did *not* assign a mortgage specialist to the Newburgh office.

24.     The Bank's mortgage specialists are located in only eight locations, not all of which are bank branches, and all of which are situated in suburban counties.  Even though Ulster Savings Bank made the choice to expand beyond its immediate service counties, including by opening mortgage lending offices in Westchester County and at the far end of Long Island, in Suffolk County, it placed none of its mortgage specialists in any urban areas.

25.     Ulster Savings Bank has extended a strikingly low number of mortgages to African Americans in the past several years.  Specifically, based on publicly available data collected and reported pursuant to the Home Mortgage Disclosure Act ("HMDA"), Ulster Savings Bank provided first lien mortgages for home purchases of primary residences to only 40 African American applicants or co-applicants out of a total of 1,599 such loans from 2011-2015.

And, out of the 112 loans made across Long Island over the same time period, only a single one was to an African American borrower.

26.     On information and belief, the Bank chose the locations of its mortgage specialists to avoid lending to African Americans and/or to minimize lending to them.  In the alternative, on information and belief, the location of the Bank's mortgage lending offices has the impact of reducing the number of African American applicants to and/or borrowers from the Bank for home mortgages.

27.     On information and belief, the Bank provides trainings, manuals, policies, and guidelines to its mortgage specialists and otherwise oversees, regulates, controls, and disciplines its mortgage specialists in ensuring quality and compliance with governing laws with respect to the offerings of loans, products, and services made by those employees/agents.

**The Fair Housing Justice Center**

28.     Founded in 2005, the mission of the Fair Housing Justice Center is to eliminate housing discrimination, promote open, accessible, and inclusive communities, and strengthen enforcement of the fair housing laws.

29.     FHJC's efforts to promote open and inclusive communities includes (a) providing information to the public and other non-profit organizations in the New York region about fair housing laws; (b) providing intake counseling to individuals and organizations with allegations of housing discrimination; (c) conducting testing and other investigations of allegations of housing discrimination; (d) making legal referrals to cooperating attorneys; (e) assisting with the preparation and filing of administrative housing discrimination complaints; and (f) providing post-referral litigation support services.  FHJC provides these and other services free of charge and without regard to income.

30.     When conducting testing investigations, FHJC dispatches individuals as "testers" – persons who pose as prospective mortgage applicants, renters, or homebuyers for the purpose of obtaining information about the conduct of lending institutions, landlords, superintendents, real estate brokers, cooperative and condominium boards, lenders, sellers, and others to determine whether illegal housing discrimination is taking place.

31.     At all relevant times, Plaintiffs Darden, Jones, and Williams, as well as the white testers who inquired about loans for purchasing residential real estate, worked for FHJC as testers.

32.     Prior to participating in the testing investigation, Plaintiffs Darden, Jones, and Williams, as well as the white testers, received training from FHJC, which included instructions on conducting tests, preparing tester report forms, and using concealed digital audio recorders during the tests.

**FHJC's Investigation of Ulster Savings Bank's Mortgage Lending Practices**

33.     After a review of publicly available data concerning Ulster Savings Bank's offices and HMDA data, FHJC decided to coordinate a targeted testing investigation of Ulster Savings Bank's policies and practices regarding home mortgage offerings for first-time homebuyers in various counties in the Hudson Valley to explore further the Bank's treatment of African American prospective buyers.

34.     FHJC assigned each tester a set of household and financial characteristics, including annual household income, cash savings available to contribute to a down payment and closing costs, monthly debt payments, and credit scores.

35.     In the paired tests, FHJC assigned the African American tester *better* financial qualifications than their white counterparts, including higher household income, more cash

9

savings, lower monthly liabilities, and higher credit scores.  FHJC trained each tester to ask the loan officer at the outset of the meeting what price home and amount of loan the tester could afford based on the financial characteristics he or she presented.

36.     FHJC structured the investigation in this way because prospective homebuyers, and first-time homebuyers in particular, often contact a lender before commencing their search for a home in order to obtain information regarding the price range of housing they are able to afford, a loan amount for which they might qualify, and what loan options would best meet their needs.  In addition, a first-time homebuyer who is unfamiliar with the process can learn from the loan officer about how to proceed and the costs associated with obtaining a home mortgage and closing on a home purchase generally.

**Riverhead Office Tests**

37.     FHJC testers conducted multiple paired tests at the Bank's Riverhead office, in Suffolk County, between 2014 and 2016, where each tester interacted with the same white male loan officer.  As detailed more fully below, these tests revealed that African American testers who each presented stronger financial qualifications than their white counterparts were informed by the same loan officer that they qualified for less appealing loan packages and could afford lower priced homes than their white counterparts.  In some cases, they were not provided information regarding certain options that were made available to their white counterpart, and in others, the African American tester was provided completely incorrect information.  In addition, the loan officer often encouraged the white testers to look for homes in more desirable neighborhoods and villages that offer more and better services, whereas he did not encourage the African American testers to focus on such elements in their search for a home.

*Riverhead - Late October/Early November 2014 Tests*

38.     On October 28, 2014, FHJC sent Laurel Devaney, a white woman, to meet with an Ulster Savings Bank mortgage specialist named David Catalano.  FHJC instructed Ms. Devaney to inform Mr. Catalano that she was a first-time homebuyer and was interested in learning what home price she could afford and for what loan amount and type she might qualify in light of her income, debt, savings, and credit score in advance of beginning her search for a home to purchase.

39.     On November 6, 2014, FHJC sent Plaintiff Lisa Darden, an African American woman, to meet with the same loan officer, and with the same assigned task.

40.     FHJC assigned Ms. Darden consistently more favorable financial information than Ms. Devaney.  Specifically, FHJC assigned Ms. Darden an annual household income of $149,300, while it assigned Ms. Devaney a lower annual household income of $145,000.  Similarly, FHJC assigned Ms. Darden total cash savings in the amount of $101,815, while assigning Ms. Devaney lower cash savings in the amount of $94,652.  FHJC assigned Ms. Darden total monthly liabilities in the amount of $560, while assigning Ms. Devaney higher monthly liabilities in the amount of $604.  Finally, FHJC assigned Ms. Darden a credit score of approximately 740 for her and her husband, while FHJC assigned Ms. Devaney lower credit scores of 725 for her and 730 for her husband.

41.     Within the first minutes of his meeting Ms. Darden – and before he bothered to inquire about her particular financial qualifications – Mr. Catalano appeared to make several assumptions about Ms. Darden.  He launched immediately into a detailed description of the state-sponsored loan programs available to first-time homebuyers.  Even after Ms. Darden indicated that her annual household income would exceed the income limitations imposed by the government loan programs (thereby making her ineligible for the programs), Mr. Catalano

11

continued to provide an explanation of the programs' benefits.  Having been told that Ms.

Darden's annual household income approached $150,000, he proceeded to provide a detailed

explanation of FHA loans without even inquiring about her cash savings (which were substantial

and likewise made her ineligible for any FHA loan offering).  In contrast, when Ms. Devaney

asked about first-time homebuyer programs, Mr. Catalano dismissed them out of hand as not for

her because Ms. Devaney's financial characteristics exceeded the limits for such programs.

42.     Ultimately, Ms. Darden was told she qualified for a maximum purchase price of

$781,000 based purely on her debt to income ratio ("DTI").  In contrast, the white tester was

quoted a higher maximum purchase price of $875,000, purportedly based on the same DTI

calculations, despite the fact that she presented weaker financial characteristics than Ms. Darden

across every category.  Mr. Catalano told Ms. Darden that the recommended maximum purchase

price amount for which she should aim was $450,000, whereas he recommended to Ms. Devaney

that she could look for homes with purchase prices up to $600,000.

43.     In short, Ms. Darden's "Buying Power" as touted by Ulster Savings Bank on its

website was $150,000 less, even though she presented better financials than her white

counterpart.

44.     Mr. Catalano also advised Ms. Darden that she would qualify for a maximum loan

amount of $695,000, but then immediately suggested that given the limitations on conventional

loans, Ms. Darden would qualify for a conforming loan of $625,500 at the most.  In stark

contrast, Mr. Catalano told the white tester that she qualified for a maximum loan amount of

$717,000 and that while that amount exceeded the $625,500 cap for conventional loans at

existing interest rates, funds beyond the $625,500 could be made available to her directly

through Ulster Savings Bank.  Ms. Darden was not informed about any program through which she might obtain a mortgage greater than $625,500.

45.    Mr. Catalano recommended to both testers that they take advantage of an 80-10-10 loan scenario in which 80% of the purchase price is financed through a conventional loan, 10% is a cash down payment, and the remaining 10% is financed through a secondary line of credit through Ulster Savings Bank.  Ms. Darden was informed about two such scenarios – one for a purchase price of $695,000 and one for a purchase price of $450,000.  But she was strongly encouraged to look for houses that fell in the latter category.  She was quoted an interest rate of 5.25% for the secondary line of credit.  Ms. Devaney was also informed about two scenarios involving an 80-10-10 structure: one for a purchase price of $500,000 and one for a purchase price of $600,000.  She was advised to look for homes in the $600,000 range, and was quoted a lower interest rate of 5% for the secondary line of credit that would be funded directly by Ulster Savings Bank.

46.    In an apparent effort to illustrate for the white tester all available options at her disposal, Mr. Catalano also described a loan scenario with a purchase price of $481,000 where she could make a 5% down payment and pay monthly mortgage insurance.  Ms. Darden was not provided with any details regarding a financing scenario in which she could put down less than 20% and not take out a secondary line of credit to cover the remainder of the purchase price or where she could put down less than 10% on the property.

47.    Mr. Catalano went to great lengths to encourage the white tester to consider where the "best schools" are and "what's the best community" in which she and her husband could potentially raise a family.  He suggested to her that she look in towns such as Smithtown and Lake Grove, which "are the areas we [Catalano and his family] are looking at."  Mr. Catalano

told Ms. Devaney that a lower purchase price of $300,000 would make her monthly payments very manageable, but that such a low home price would limit the areas in which she would be looking and ultimately she should be focusing on "where do we want to raise our children?"  He made specific reference to several other towns and areas, including East Quogue (where he pointed out that the homes are very large and expensive and the taxes are lower), Wading River and Manorville (which he described as having smaller houses with high tax rates), Southold (which he noted is one of the five easternmost townships that impose an additional "preservation tax" at the closing), Western Suffolk, Holbrook, Hauppauge, Bohemia, and Smith Haven.

48.     In contrast, Mr. Catalano never mentioned to Ms. Darden that she should focus on determining where the best schools or best communities are located.  Instead, he only volunteered to her that Shirley was an undesirable area with lower taxes, and that Manorville had higher taxes.

49.     According to the most recent available census data, all of the towns Mr. Catalano mentioned to Ms. Devaney are at least 87% white and less than 3% African American.  Shirley, the only town Mr. Catalano mentioned to Ms. Darden that he did not mention to Ms. Devaney, is only 81.50% white and is 7.2% African American.

50.     Both testers inquired about whether "points" would be added to the closing costs. Mr. Catalano told Ms. Devaney that there would be no points charged unless her credit score was under 680, in which case there might be a ¼ point charged.  In contrast, Mr. Catalano told Ms. Darden that a ¼ point would be charged if her credit score was determined to be under 740 (the credit score she had already presented to him at the outset).

### *Riverhead - May/June 2016 Test*

51.     On May 18, 2016, FHJC sent Bryan Hickey, a white man, to meet with David Catalano, the same Ulster Savings Bank mortgage specialist at the Riverhead office.  Mr. Hickey was instructed to make the same inquiries as Ms. Darden and Ms. Devaney were told to make, *i.e,.* that he and his wife were first time homebuyers looking to understand what price range they could reasonably afford and what loan options would be available to them before they launched their search for a home.

52.     On June 2, 2016, FHJC sent Plaintiff Claude Jay Jones, an African American man, to visit with the same loan officer and make the same inquiries.

53.      FHJC assigned Mr. Jones an annual household income of $156,450, while it assigned Mr. Hickey a lower annual household income of $151,040.  Similarly, FHJC assigned Mr. Jones total cash savings in the amount of $108,880, while assigning Mr. Hickey lower cash savings in the amount of $103,788.  FHJC assigned Mr. Jones total monthly liabilities in the amount of $587.25, while assigning Mr. Hickey higher monthly liabilities in the amount of $630.

54.     Both testers were encouraged to find a home in similar price ranges, with a recommended maximum purchase price of $500,000.  Notwithstanding this framework, the white Mr. Hickey was told by Ulster Savings Bank that he would qualify for a maximum loan amount of $870,000, while Mr. Jones was told the maximum loan amount he could qualify for was $670,000, despite that he presented stronger financial characteristics.  In fact, Mr. Catalano – who has been in the mortgage lending business for more than a decade and, upon information and belief, has conducted dozens if not hundreds of preliminary calculations for prospective homebuyers – deviated from his usual formula in calculating Mr. Jones's DTI, which resulted in a maximum loan amount that was $200,000 *less* than it should have been.

55.     Although Mr. Catalano advised both testers that they could each afford a $500,000 house, Mr. Hickey was told that his monthly mortgage payments on a $500,000 house would be considerably less than the monthly payments Mr. Jones was told he would have to pay.

56.     Mr. Catalano also described in detail three financing options for Mr. Hickey, two of which included an 80-10-10 option that would allow Mr. Hickey to put down less than 20% and still avoid paying onerous monthly mortgage insurance payments.  Mr. Jones was told about two financing options but was never informed that there was an alternative to paying for mortgage insurance in the event he chose to put less than 20% down.

57.     Mr. Catalano encouraged Mr. Jones to look for a home in the middle of Long Island, and indicated that places like "Dix Hills and Squab" are "all over the map" as far as taxes, and regarding "how comfortable the community is."  He also cautioned Mr. Jones that areas like Quogue and East Quogue illustrate the phenomenon of very high house prices and low taxes.  In contrast, Mr. Catalano told Mr. Hickey about Manorville and Wading River as desirable locations to consider.  He also told Mr. Hickey that Quogue has "tremendous" houses and very low taxes.

58.     According to most recent available census data, Manorville and Wading River – two of the towns Mr. Catalano encouraged Mr. Hickey to look in but did not mention to Mr. Jones – are 93 and 94% white, with a 2% or less African American population.  Dix Hills, which Mr. Catalano mentioned to Mr. Jones but not to Mr. Hickey, is 79.9% white and 5.5% African American.

59.     Mr. Catalano also made a point to Mr. Jones that once he had actually found a home and would like to obtain a pre-qualification letter from Ulster Savings Bank, Mr. Jones would have to show Mr. Catalano "the income documents," such as his W-2s and pay stubs, to

confirm that what Mr. Jones represented was his annual household income was, in fact, his annual household income.  Mr. Catalano emphasized this twice during their meeting, but did not bother ever mentioning it to Mr. Hickey.

### White Plains Office Test

60.     Starting in October 2014, FHJC sent a pair of testers to investigate the policies and practices of mortgage specialists at Ulster Savings Bank's White Plains office.  As detailed more fully below, a white female loan officer informed the African American tester that her potential maximum home purchase price and available mortgage were both lower than her white counterpart, who presented multiple weaker financial characteristics.  The African American tester was also quoted an unrealistic and very high closing cost estimate, while the white tester was given a more realistic and lower quote for closing costs.

61.     On October 30, 2014, FHJC sent Vanessa Dawson, a white woman, to meet with Margaret O'Connor, a loan officer in the White Plains office.  FHJC instructed Ms. Dawson to inform Ms. O'Connor that she was a first-time homebuyer and was interested in learning what home price she could afford and for what loan amount and type she might qualify in light of her income, debt, savings, and credit score in advance of beginning her search for a home to purchase.

62.     On December 1, 2014, FHJC sent Plaintiff Lisa Darden, an African American woman, to meet with the same loan officer in the White Plains office and to make the same inquiries as Ms. Dawson.

63.     FHJC assigned Ms. Darden an annual household income of $149,383, while it assigned Ms. Dawson a lower annual household income of $145,200.  Similarly, FHJC assigned Ms. Darden total cash savings in the amount of $101,815, while assigning Ms. Dawson lower

cash savings in the amount of $100,119. FHJC assigned Ms. Darden total monthly liabilities in the amount of $560, while assigning Ms. Dawson higher monthly liabilities in the amount of $604. Finally, FHJC assigned Ms. Darden a credit score of approximately 740 for her and her husband, while FHJC assigned Ms. Dawson lower credit scores of 725 for her and her husband.

64.     Ms. O'Connor told Ms. Darden that she could afford a home with a maximum purchase price of $500,000 and that she qualified for a maximum loan amount of $400,000. In contrast, Ms. O'Connor told the white tester, Ms. Dawson, that she could afford a home with a purchase price of up to $550,000 and that she qualified for a maximum loan amount of $495,000.

65.     The white tester was also provided detailed information regarding two financing scenarios: one for a purchase price of $460,000 and one for a purchase price of $550,000. For the latter scenario, Ms. O'Connor described for Ms. Dawson how a 10% down payment would work, including monthly mortgage insurance payments. In contrast, Ms. Darden was informed about two financial scenarios: one for a $400,000 home and one for a $500,000 home. Ms. O'Connor mentioned to Ms. Darden that taking on an additional monthly payment for mortgage insurance could permit her to put less than 20% down at closing, but did not provide any detailed illustration and emphasized the benefits of avoiding PMI.

66.     Ms. Darden was told that the estimated closing costs for the transaction of the kind she was contemplating would be approximately 5% of the purchase price. The price range of $400-500,000 homes outlined for Ms. Darden by Ms. O'Connor would translate to $20-25,000 in closing costs according to the 5% Ms. O'Connor quoted to Ms. Darden. The white tester, in contrast, was told that the closing costs would be approximately $15,000.

**Goshen Office Test**

67.     Beginning in October 2014, FHJC sent a pair of testers to investigate the policies and practices of mortgage specialists at Ulster Savings Bank's Goshen office.  As detailed more fully below, the white tester was told she would qualify for a higher loan amount and should look for houses with a higher price range than the African American tester, who presented stronger financial characteristics.  The African American tester was also told he would likely be charged a ½ point at closing, which the loan officer built into the estimated loan scenario, while the white tester was told from the outset that no points would be charged.  Despite presenting similar (if not better) financial characteristics to the Ulster Savings Bank representatives, the African American tester walked out of his meeting with considerably less appealing financing options than the white tester did.

68.     On October 30, 2014, FHJC sent Kate Haggerty, a white woman, to meet with an Ulster Savings Bank mortgage specialist named Jack Fanning.  FHJC instructed Ms. Haggerty to inform Mr. Fanning that she was a first-time homebuyer and was interested in learning what home price she could afford and for what loan amount and type she might qualify in light of her income, debt, savings, and credit score in advance of beginning her search for a home to purchase.

69.     On November 6, 2014, FHJC sent Plaintiff Claude Jay Jones to meet with an Ulster Savings Bank mortgage specialist, Susan Boersema, at the same Goshen office with the same assigned task.

70.     FHJC assigned Mr. Jones an annual household income of $149,380, while it assigned Ms. Haggerty a lower annual household income of $145,000. FHJC assigned Mr. Jones total cash savings in the amount of $101,344, while assigning Ms. Haggerty cash savings in the

amount of $102,790.  FHJC assigned Mr. Jones total monthly liabilities in the amount of $560, while assigning Ms. Haggerty higher monthly liabilities in the amount of $604.39.  Finally, FHJC assigned Mr. Jones a credit score 735 for him and his wife, while FHJC assigned Ms. Haggerty a lower credit score of 725 for her and her husband.

71.     Using an unnaturally friendly tone right from the start, Mr. Fanning appeared to be "buttering up" Ms. Haggerty, attempting to joke with her, referring to her as "kiddo" in the first minute of their meeting, and taking on a highly familiar tone with her throughout the conversation.  He told her that based on her financial characteristics, she would qualify for "way more than a $500,000 mortgage," but that he suggested she not seek the maximum she could qualify for, instead counseling her to consider something slightly more modest to ensure that she is not "house poor."  He suggested that Ms. Haggerty look for a home with a purchase price of $500,000 that would involve a $400,000 loan.  Mr. Fanning also told Ms. Haggerty that the process would be exceptionally quick for her, and that he could "get [her] into a house in three weeks."  Mr. Fanning appeared to engage fully with Ms. Haggerty in an effort to establish a rapport with her and solidify her business as an Ulster Savings Bank customer.

72.     In contrast, Ms. Boersema did not take Mr. Jones through the typical DTI calculations at the outset of their meeting.  Instead, she inquired about his financial qualifications and current monthly rent, and proceeded to suggest a loan scenario with a purchase price of $350,000 and a $280,000 mortgage.  As noted above, Ms. Haggerty was told that she qualified her for a purchase price of more than $500,000, even though Mr. Jones had presented stronger financial characteristics.  Notwithstanding that Mr. Jones's financial profile qualified him for a much higher purchase price and loan amount, Ms. Boersema explored financing options involving purchase prices capped at $400,000.

73.     From the outset, Mr. Fanning told the white tester, Ms. Haggerty, that she would
not be charged any points on her transaction.  Yet Ms. Boersema informed the African American
Mr. Jones, after he had shared that his and his wife's credit scores were each 730, that with that
credit score and with a 20% down payment, she would automatically include a ½ point in the
transaction.

74.     Ms. Haggerty mentioned to Mr. Fanning that she had liked the Monroe area, but
otherwise Mr. Fanning did not name any other areas for Ms. Haggerty to focus on in her search.
Ms. Boersema, on the other, had much to say about particular areas in which Mr. Jones should
focus his search.  For instance, Ms. Boersema specifically told Mr. Jones that he could look in
Warwick, which, according to the most recent census data is 91.5% white and only 2.9% African
American, but discouraged him from doing so because it is "very expensive."  She told Mr.
Jones he would likely need to be in Orange County, which is 77.2% white and 10.2% African
American.  Mr. Jones was encouraged specifically to look at Newburgh, which is 39.4% white
and 30.2% African American.  Other areas Ms. Boersema mentioned to Mr. Jones have white
populations hovering around 80-82% and African American populations between 4-9%.

**Poughkeepsie Office Test**

75.     Beginning in October 2014, FHJC sent a pair of testers to investigate the policies
and practices of mortgage specialists at the Poughkeepsie office of Ulster Savings Bank.  As
detailed more fully below, the white tester was told she would qualify for a higher loan amount
and should look for houses with a higher price range than the African American tester, who
presented stronger financial characteristics in all four categories.  The African American tester
was told that she would be charged a fraction of a point if she put less than 25% down at the
closing, while the white tester was told she would not be charged any points.  The African

21

American tester was also told that the bank fees would be much greater than the bank fees quoted to the white tester.  Ultimately, the African American tester was provided with less appealing options notwithstanding her superior financial qualifications, reflecting a lack of desire or effort by the loan officer to affirmatively capture her business as a home mortgage customer.

76.     Specifically, on October 29, 2014, FHJC sent Barbara Tirrell, a white woman, to meet with a loan officer named Shawn Simmons.  FHJC instructed Ms. Tirrell to inform Mr. Simmons that she was a first-time homebuyer and was interested in learning what home price she could afford and for what loan amount and type she might qualify in light of her income, debt, savings, and credit score in advance of beginning her search for a home to purchase.

77.     On November 18, 2014, FHJC sent Plaintiff Adrienne Williams, and African American woman, to meet with an Ulster Savings Bank mortgage specialist named Michael Kienle with the same assigned task.

78.     FHJC assigned Ms. Williams an annual household income of $149,140, while it assigned Ms. Tirrell a lower annual household income of $144,900.  Similarly, FHJC assigned Ms. Williams total cash savings in the amount of $100,925, while assigning Ms. Tirrell lower cash savings in the amount of $99,127.  FHJC assigned Ms. Williams total monthly liabilities in the amount of $560, while assigning Ms. Tirrell higher monthly liabilities in the amount of $604. Finally, FHJC assigned Ms. Williams a credit score 735 for her and her husband, while FHJC assigned Ms. Tirrell a lower credit score of 725 for her and her husband.

79.     After calculating her DTI based on the financial characteristics Ms. Williams provided, Mr. Kienle told her she could afford a purchase price of $400-500,000 and that she could qualify for a loan amount up to $800,000.  Notwithstanding that calculation, Mr. Kienle then proceeded to provide details for only one financing option – for a $400,000 home.  That

loan package included a $320,000 conventional loan with a 20% down payment.  In contrast, Ms. Tirrell was told that she could afford a house that cost up to $600,000 and that she would qualify for a maximum loan of $900,000.

80.     Mr. Kienle told African American Ms. Williams that if she paid less than 25% of the purchase price in cash at the closing, she would be charged points, even with a credit score of 730.  Mr. Kienle stated explicitly that if she made a 20% down payment, she would be charged ¼ of a point.  The white tester, Ms. Tirrell, was told that there would be no need for her to consider points and that she should stay away from points as a general matter, even in the context of a strategic investment.

81.     Ms. Williams was also quoted $1,800 in "bank fees," which Mr. Kienle never itemized for her.  Ms. Tirrell – and indeed each tester in the other tests described in this Complaint – was quoted bank fees of approximately $1,000-1,100.

82.     Mr. Simmons spoke with Ms. Tirrell in great detail about certain areas and towns he suggested she should explore in her search for a home.  Mr. Kienle made no effort to engage Ms. Williams in a discussion of what areas she might consider looking in for her home.

**The Significant and Far-Reaching Injury of Ulster Savings Bank's Actions**

83.     Ulster Savings Bank's so-called "mortgage specialists" consistently offered less appealing and more modest loan packages to the African American testers than were offered to their white counterparts.  In doing so, these mortgage specialists acted on the Bank's behalf as its representatives, employees, and/or agents.

84.     Based on the above tests, the policies and/or practices of the Bank's mortgage specialists are to treat African Americans worse than white customers, and to offer them lower loans with less beneficial terms.  In the alternative, the policies and/or practices of the Bank's

mortgage specialists have the impact and effect of treating African Americans worse than white customers, offering African Americans lower loans with less beneficial terms.

85.     Ulster Savings Bank knew or should have known that its mortgage specialists were engaged in discriminatory behavior, not only because of the actual terms and conditions of the mortgages being offered by individual mortgage specialists, but because of the Bank's systemic approach to its choice of mortgage office locations, and because of the extremely low number of African American mortgage borrowers it actually serves.  Ulster Savings Bank took no steps to correct its discriminatory actions or impact or the discriminatory actions or impact of its mortgage specialists.

86.     Over and over again, Defendant, through its mortgage specialists, treated African Americans differently than their white counterparts, notwithstanding the fact that the African Americans presented with higher income, better savings, lower monthly liabilities, and better credit scores.  Even in one additional test not set forth above – where the African American tester was told he could qualify for a slightly higher loan amount and purchase price than his white counterpart – that loan scenario was offered in the context of a *government-sponsored loan* where Ulster Savings Bank had no stake in the transaction.  More frequently, and certainly whenever Ulster Savings Bank's own money and reputation are on the line, however, African American prospective borrowers are told about less expensive homes and smaller loans, and informed of higher closing costs.

87.     Through the Bank's loan officers' active miscalculations in implementing simple formulas, inaccurate invocation of charging points, higher quotes for closing costs and bank fees, and subtle encouragement of exploring areas more heavily populated by African Americans (or failure to be specific at all about how or where to search), the cumulative impact is profound:

the overall effect is to discourage African American prospective homebuyers from better loans and better homes, and to diminish the opportunities available to African Americans for doing so.

88.     The discriminatory behavior has wide ranging consequences.  On a systemic level, it denies African Americans the opportunity to purchase homes at higher prices, albeit ones that should be available to them based on the objective, financial indicators.  Instead, it guides African Americans towards lower costing homes and, ultimately, often less desirable villages and towns, with fewer or lesser services and opportunities.

89.     On an individual level, it subjected Ms. Darden, Mr. Jones, and Ms. Williams to debasement and humiliation, conveying to them clearly that they are, in the eyes of Ulster Savings Bank, lesser citizens than their white counterparts and not worthy of the effort to cultivate them as customers or of borrowing Ulster Savings Bank's money.

90.     In addition, Defendant's discriminatory lending practices have diverted FHJC's resources, which could have instead been used to further fair housing in the region.  Rather than focus on counseling, training, and providing information to further fair and equal housing opportunities, FHJC instead had to spend more time and resources to counteract Ulster Saving Bank's discriminatory lending practices.  And the Bank's actions also frustrated, and continue to frustrate, FHJC's core mission to ensure that all people in the New York region have equal access to housing opportunities, including by providing terms and conditions of home mortgage loan applications in an equal manner without regard to race or color.

91.     Ulster Savings Bank's discriminatory lending practices must be stopped.  They must be affirmatively corrected, and the Bank must remedy its past unlawful actions.

**FIRST CAUSE OF ACTION**
(Federal Fair Housing Act – 42 U.S.C. § 3601 *et seq*.)

92.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth

herein.

93.     The residential mortgages offered by Defendant constitute "residential real estate-

related transactions" as defined by Section 3605(b)(1) of the Fair Housing Act, 42 U.S.C. §

3605(b)(1).

94.      Defendant's conduct as set forth above constitutes discrimination in making

available such residential real estate-related transactions and/or discriminating in the terms or

conditions of such transactions because of race or color, in violation of the Fair Housing Act, 42

U.S.C. § 3605(a).

95.     Defendant's conduct as set forth above constitutes "[f]ailing or refusing to

provide information regarding the availability of loans or other financial assistance," and/or

"providing information which is inaccurate or different from that provided others" because of

race or color and/or "failing to provide, or discouraging the receipt of loans or other financial

assistance in a manner that discriminates in their denial rate or otherwise discriminates in their

availability" because of race or color, in violation of the Fair Housing Act.  24 C.F.R. §

100.120(b)(1), (2).

96.     Defendant's conduct as set forth above, including without limitation Defendant's

failure to offer mortgages at amounts commensurate with objective financial indicators and/or as

high as mortgages offered to white applicants, constitutes a refusal to sell or the refusal to

negotiate the sale of or otherwise make unavailable or deny, a dwelling to a person because of

race or color, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

97.     Defendant's conduct as set forth above, including without limitation Defendant's description of higher closing costs, constitutes discrimination in the terms, conditions or privileges of sale of a dwelling because of race or color, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b).

98.     Defendant's conduct as set forth above, including without limitation Defendant's failure to offer mortgages at amounts commensurate with objective financial indicators and/or as high as mortgages offered to white applicants and Defendant's statements concerning neighborhoods or areas to consider in purchasing a home, constitutes making any statement with respect to the sale of a dwelling that indicates a preference, limitation or discrimination based on race or color, in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

99.     Plaintiffs are aggrieved persons as defined in 42 U.S.C. §§ 3602(d) and (i), have been injured by the Defendant's discriminatory conduct, and have suffered damages as a result.

100.     Defendant's unlawful conduct was intentional, willful, and made in disregard for the rights of others.

101.     Accordingly, pursuant to 42 U.S.C. §§ 3613(a) and (c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
(Civil Rights Act of 1866 – 42 U.S.C. §1982)

102.      Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

103.     Defendant's conduct as set forth above prevented Plaintiffs Darden, Jones, and Williams from enjoying the same right as is enjoyed by white citizens to purchase real property in violation of Section 1982 of the Civil Rights Act of 1866.

104.     Plaintiffs Darden, Jones, and Williams have been injured by Defendant's discriminatory conduct and have suffered damages as a result.

105.     Defendant's conduct was intentional, willful, and made in disregard for the rights of others.

106.     Accordingly, pursuant to 42 U.S.C. §§ 1982 and 1988, Plaintiffs Darden, Jones, and Williams are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
(New York Executive Law § 290 *et seq.*)

107.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

108.     The residential mortgages offered by Defendant constitute "credit" as defined by Section 292(20) of the New York Executive Law, Article 15 (New York Human Rights Law), and Defendant is a "creditor" as defined by Section 292(22).

109.     Defendant's conduct as set forth above constitutes an unlawful discriminatory practice that discriminates in the granting, withholding, or extending, or in the fixing of the rates, terms or conditions of any form of credit on the basis of race or color in violation of the New York Executive Law § 296-a(b).

110.     Defendant's conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by New York Executive Law § 296(5), in violation of the New York Executive Law § 296(6).

111.     Plaintiffs have been injured by Defendant's discriminatory conduct and have suffered damages as a result.

112.    Defendant's conduct was intentional, willful, and made in disregard for the rights of others.

113.    Accordingly, pursuant to Article 15 of the New York Executive Law § 297, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION

(Suffolk County Human Rights Law, Section 528 *et seq.*)

114.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

115.    The residential mortgages offered by Defendant constitute "credit" as defined by Section 528-6 of the Suffolk County Human Rights Law, and Defendant is also a "creditor" as defined therein.

116.    Defendant's conduct as set forth above constitutes an unlawful discriminatory practice that discriminates in the granting, withholding, or extending, or in the fixing of the rates, terms or conditions of any form of financial assistance or credit on the basis of the actual or perceived race or color in violation of Suffolk County Human Rights Law, § 529-10.

117.    Defendant's conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by Suffolk County Human Rights Law, in violation of the Suffolk County Human Rights Law § 528-12(A).

118.    Plaintiffs Darden, Jones and Fair Housing Justice Center, Inc., have been injured by Defendant's discriminatory conduct and have suffered damages as a result.

119.    Defendant's conduct was intentional, willful, and made in disregard for the rights of others.

120.     Accordingly, pursuant to Article 15 of the Suffolk County Human Rights Law §
528-13(R)(1) and (5), Plaintiffs Darden, Jones and Fair Housing Justice Center, Inc. are entitled
to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a.     An order and judgment declaring that Defendant's discriminatory practices
violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*., the Federal Civil Rights Act,
as amended, 42 U.S.C. § 1982, the New York State Human Rights Law, New York Executive
Law § 290 *et seq*., and the Suffolk County Human Rights Law, § 528 *et seq*.;

b.     An order and judgment enjoining Defendant, Defendant's agents, employees, and
successors, and all other persons in active concert or participation from:

> (i)     discriminating in making available residential real estate-related transactions,
> credit, and/or financial assistance on the basis of the race or color of
> prospective borrowers, applicants, or customers;

> (ii)    failing or refusing to provide information regarding the availability of loans,
> credit, or financial assistance or application requirements because of the race
> or color of prospective borrowers, applicants or customers;

> (iii)   providing information regarding residential real estate-related transactions,
> credit, and/or financial assistance or application requirements which is
> inaccurate or different from that provided to others because of the race or
> color of prospective borrowers, applicants, or customers;

> (iv)    making any statement with respect to the sale of a dwelling that indicates a
> preference, limitation, or discrimination based on race or color of the

prospective borrower, applicant, or customer, or the residents of the area in which a dwelling is located, or the intent to make such preference, limitation, or discrimination;

(v)   discriminating in the granting, withholding, extending or renewing or in the fixing of the rates, terms or conditions of any form of residential real estate transaction, loan, or financial assistance to purchase a housing accommodation based on the race or color of a prospective borrower, applicant, or customer;

(vi)   aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by the New York State Executive Law and/or the Suffolk County Human Rights Law;

c.   An order and judgment enjoining Defendant, Defendant's agents, employees, and successors, and all other persons in active concert or participation to:

(i)   make all necessary modifications to their policies, practices, and procedures of offering or negotiating residential real estate-related transactions, credit and/or financial assistance to the public to conform and comply with fair lending/housing and human and civil rights laws;

(ii)   train all management, agents, and employees on pertinent fair housing/lending, civil, and human rights laws;

(iii)   implement criteria, terms, loan products, conditions, and/or incentives for residential mortgages that counteract the harm caused by Defendant's past discriminatory policies and practices;

(iv)   allow monitoring of its residential lending process;

31

     (v)     retain records to allow for appropriate monitoring;

     (vi)     develop a written fair lending policy to be distributed to all employees and agents;

     (vii)     undertake active efforts and steps to ensure that African Americans seek out and obtain information and assistance from Defendant and are assisted in meaningful ways to obtain information regarding available options for residential loans, mortgages, and/or financial assistance and are offered such assistance in accordance with relevant objective criteria; and

     (viii)     establish a system so that their agents can be tested for unlawful discriminatory practices;

d.     An order and judgment awarding monetary damages to Plaintiff FHJC to compensate it fully for the economic losses, diversion of resources, and interference with mission fulfillment caused by Defendant's unlawful discriminatory practices;

e.     An order and judgment awarding monetary damages to compensate the individual Plaintiffs fully for any loss of civil rights, as well as for the humiliation, embarrassment, and emotional distress suffered due to Defendant's unlawful discriminatory conduct;

f.     An order and judgment awarding punitive damages;

g.     An order and judgment awarding Plaintiffs reasonable attorneys' fees, costs, interest and expenses incurred in prosecuting this action;

h.     Interest on any and all such awards; and

i.     Any further relief that may be just and proper.

Dated: New York, New York
      November 4, 2016

By: _____
        Mariann Meier Wang
        Alice G. Reiter

CUTI HECKER WANG LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603
mwang@chwllp.com
areiter@chwllp.com

*Attorneys for Plaintiffs*