# CUTI HECKER WANG LLP

305 BROADWAY, SUITE 607
NEW YORK, NY 10007

MARIANN MEIER WANG
212.620.2603 TEL
212.620.2613 FAX

MWANG@CHWLLP.COM

**MEMO ENDORSED**

*By ECF*

February 1, 2017

Hon. Kenneth M. Karas
United States District Court
300 Quarropas Street, Chambers 533
White Plains, New York 10601

      Re:    *FHJC, et al. v. Ulster Savings Bank*, 16 Civ. 8608 (KMK)

Your Honor:

      This firm represents Plaintiffs in the above-referenced action. We write in opposition to Defendant Ulster Savings Bank's ("Ulster") pre-motion letter dated January 23, 2017. ECF No. 13. The Court granted Plaintiffs permission to submit their response by today. ECF No. 15. Ulster seeks leave to move to dismiss a Complaint that details extensive evidence of discrimination against African-Americans, gathered during a two-year investigation. Ulster has no basis for such a motion, and so it resorts to name-calling, conjecture, and citation to inapposite cases. A motion to dismiss in this case would be a waste of resources and time.

      The Complaint contains a wealth of substantiated evidence showing differential and worse treatment of African-Americans than whites by Ulster employees. This is more than sufficient to pass muster under the *Twombly/Iqbal* standard Ulster references but does not describe. *Cales v. New Castle Hill Realty*, 10 Civ. 3426 (DAB), 2011 WL 335599, at *3 (S.D.N.Y. Jan. 31, 2011) (housing discrimination complaint need only be facially plausible and give "fair notice to the defendants of the basis for the claim"). The Complaint alleges that, after being trained, sets of individually paired testers (one African-American, one white) met with Ulster loan officers and posed as first-time homebuyers inquiring about the loan amounts and purchase prices they might qualify for in advance of starting a property search. Prospective homebuyers, particularly those new to the market, often consult informally with loan officers to learn about the process and inquire about the specific financial parameters that should guide their searches. ECF No. 1 ("Compl.") ¶ 36. Indeed, Ulster itself touts its ability to identify with precision any customer's "Buying Power" – that is, how much a potential borrower can afford to pay for a house. *Id.* ¶ 1. Information provided by loan officers at such initial interactions can have the effect of directing a prospective borrower toward lower-value homes, thus depriving them of the opportunity to gain equity in more valuable property. *Id.* ¶ 7.

      Among other information, each tester-customer presented to the loan officer his or her household income, savings, monthly debt payments, and credit score. *Id.* ¶ 34. These data points are used to calculate the debt-to-income ratio ("DTI"), which is often used by lenders to determine an individual's capacity to maintain a residential mortgage and which often guides a homebuyer's property search. See http://www.consumerfinance.gov/askcfpb/1791/what-debt-income-ratio-why-43-debt-income-ratio-important.html (CFPB website). The African-

Case 7:16-cv-08608-KMK-PED Document 17 Filed 02/07/17 Page 2 of 3
Case 7:16-cv-08608-KMK Document 16 Filed 02/01/17 Page 2 of 3

February 1, 2017
Page 2 of 3

Americans presented *more* favorable financial data than their white counterparts. *Id.* ¶ 35. Notwithstanding that DTI calculations are formulaic and should have been conducted uniformly based on the objective data provided by each prospective borrower, Ulster loan officers (in different offices and over time) repeatedly told the African-Americans that they qualified for *lower* purchase prices and loan amounts than the whites, despite having provided *better* financial qualifications. *See, e.g., id.* ¶¶ 42-44 (African-American told she had $150,000 *less* in buying power than white), 54 (African-American told he would qualify for $200,000 *less* in loan amount than white), 64 (African-American told she qualified for purchase price $55,000 *lower* than and a mortgage nearly $100,000 *less* than white), 79 (African-American told she qualified for purchase price and loan amount that were each $100,000 *lower* than white).

Ulster asks this Court to ignore numerous specific allegations raising inferences of discriminatory conduct and to find Plaintiffs have failed to state a plausible claim.[1] Ulster relies primarily on *Grimes v. Fremont General Corporation* to assert that the Complaint lacks the requisite specificity. But the complaint in that case contained only conclusory allegations and none approaching the specificity of Plaintiffs' allegations here. 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011) (allegations are "conclusory" and "unsupported by specific factual allegations" and FHA claim dismissed as time-barred). Ulster's other cases are likewise inapposite.[2]

*Grimes* stands in stark contrast to the considerable detailed factual allegations in the Complaint, which include inconsistent DTI calculations conducted for African-Americans versus whites and numerous specific allegations of discrepancies in the loan officers' use of other objective data and which resulted in disparate treatment of the African-Americans based on race. *See, e.g.*, Compl. ¶¶ 45 (African-American quoted higher interest rate for secondary line of credit than white); 50 (African-American quoted ¼ point charge if credit score under 740 whereas white quoted ¼ point charge if credit score under 680); 66 (African-American quoted 5% closing costs, which was $5-10,000 higher quoted closing costs than white); 80 (African-American told points would be charged if less than 25% down whereas white told points not an issue). The Complaint more than adequately states a claim for discrimination. *Boykin v. KeyCorp*, 521 F.3d 202, 214-16 (2d Cir. 2008) (vacating dismissal of FHA claim, in light of *Twombly/Iqbal*, where plaintiff alleged membership in protected class, described defendant's actions, and alleged different treatment than similarly situated loan applicants because of her race); *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401-02 (S.D.N.Y. 2013) (denying motion to dismiss FHA claims where plaintiff alleged membership in protected class, how she was treated differently than those not in protected class, and theory of intentional discrimination).

---

[1] Ulster purports to attack all four causes of action; however, the focus of its letter, and thus this response, is on the principal claim under the Fair Housing Act ("FHA"). Ulster's vague attack on Plaintiffs' Section 1982 claim is unpersuasive. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (rejecting a "narrow construction of the language of [Section] 1982").

[2] *See Ng v. HSBC Mortg. Corp.*, 07-CV-5434 (RRM)(VVP), 2010 WL 889256, at *13 (E.D.N.Y. Mar. 10, 2010) (allegations "are wholly conclusory, and consist of little more than the bare language of the statutes"); *Echeverria v. Krystie Manor, LP*, 07-CV-1369 (WDW), 2009 WL 857629 (E.D.N.Y. 2009) (denying summary judgment); *Adkins v. Morgan Stanley*, 307 F.R.D. 119 (S.D.N.Y. 2015) (denying class certification).

Case 7:16-cv-08608-KMK-PED Document 17 Filed 02/07/17 Page 3 of 3
Case 7:16-cv-08608-KMK Document 16 Filed 02/01/17 Page 3 of 3

FEBRUARY 1, 2017
PAGE 3 OF 3

Defendant ignores Plaintiffs' core allegations, and instead presents four examples of purportedly insufficient pleading, none of which addresses the well-pleaded connection between the ostensibly objective calculations and the consistently lower "Buying Power," reflecting worse treatment of African-Americans than their white counterparts. ECF No. 13 at 2-3. But contrary to Ulster's conclusory statement, the Complaint details many "apples to apples" comparisons on the core financial factors. And, whether other factors may have played a part in the conversation is of no moment on a motion to dismiss. *Best v. N.Y.C. Dep't of Corr.*, 14 F. Supp. 3d 341, 349 (S.D.N.Y. 2014) (inappropriate to resolve factual disputes at pleading stage).

Moreover, the Complaint's reference to HMDA data never purports to represent a sole basis for inferring discriminatory conduct, contrary to Ulster's mischaracterization. *Compare* ECF No. 13 at 3 *with* Compl. ¶ 25 (public data reveal strikingly low number of Ulster loans to African-Americans from 2011-2015). And that Ulster's regulators allegedly approved the location of its branches or loan offices does not preclude drawing a discriminatory inference from the bank's choice *not* to staff loan officers in predominantly minority areas it otherwise serves. These facts provide the context in which Plaintiffs' other, detailed allegations confirm discriminatory conduct. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (discrimination rarely announces itself, so "plaintiffs usually must rely on 'bits and pieces' of information" – a "mosaic" – to support inference of discrimination).

Finally, contrary to Ulster's assertion otherwise, the FHA does not require a formal loan application before an individual inquiring about loans at Ulster might state a discrimination claim. *See* ECF No. 13 at 2. The Act's plain language and decades of jurisprudence interpreting it make clear that adherence to such a cramped interpretation of the statute's reach is inappropriate. Regulations enacted pursuant to the FHA provide a non-exhaustive list of prohibited practices, including "[f]ailing or refusing to provide to any person information regarding the availability of loans or other financial assistance … or providing information which is inaccurate or different from that provided others, because of race[.]" 24 C.F.R. § 100.120(b)(1). For decades, courts have endorsed application of the FHA's prohibition of *all* housing discrimination to subtle and/or hidden conduct rather than limiting its scope to prohibiting only the outright denial of an available apartment or rejection of a formal loan application. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372-78 (1982) (affirming standing in racial steering context); *City of Miami v. Citigroup, Inc.*, 801 F.3d 1268, 1275-76 (11th Cir. 2015) (reversing dismissal of FHA claim based on predatory lending practices where bank targeted group of minority borrowers for exploitative loans). Any assessment of the sufficiency of the Complaint must be viewed against the backdrop of the FHA's expansive purpose and its history, and the decades of well-established law allowing analogous claims.

*[handwritten: The Court will hold a pre-motion conference on March 8, 2017, at 10:30. So Ordered, [initials] 2/2/17]*

Very truly yours,

Mariann Wang

Mariann Meier Wang
Alice G. Reiter

cc: Counsel for Defendant, *via* ECF